# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALBERTO LUCIANO GONZALEZ TORRES,<br><br>                         Plaintiff,<br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and U.S. CUSTOMS AND BORDER PROTECTION,<br><br>                         Defendants. | CASE NO. 17cv1840 JM(NLS)<br><br>ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION; GRANTING DEFENDANTS' MOTION TO DISSOLVE PRELIMINARY INJUNCTION; GRANTING DEFENDANTS' MOTION TO DISMISS |

Plaintiff Alberto Luciano Gonzalez Torres seeks a preliminary injunction to enjoin Defendants from terminating the legal status obtained by Plaintiff pursuant to the Deferred Action for Childhood Arrivals ("DACA") program. Defendants U.S. Department of Homeland Security ("DHS"), U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Customs and Border Protection ("CBP") oppose the motion and separately move to dissolve this court's September 29, 2017 Order Granting Motion for Preliminary Injunction ("Order") and to dismiss the First Amended Complaint ("FAC") for failure to state a claim. Having carefully considered the matter presented, the court record, the

arguments of counsel and, for the reasons set forth below, the court denies the motion for preliminary injunction, grants the motion to dissolve the original preliminary injunction, and grants the motion to dismiss the FAC without leave to amend.

## BACKGROUND

On September 11, 2017, Plaintiff commenced this declaratory and injunctive relief action seeking a declaration that the automatic termination of his DACA status on May 7, 2016, without notice or an opportunity to contest the termination, (1) failed to comply with the DACA Standard Operating Procedures ("DACA SOP"); (2) violated the arbitrary, capricious, and abuse of discretion standard of the Administrative Procedure Act ("APA"); and (3) violated Plaintiff's Procedural Due Process rights under the Fifth Amendment. (ECF 1).[1]

Following oral argument on Plaintiff's motion for a temporary restraining order, on September 29, 2017, the court granted the motion for injunctive relief and provisionally ordered: (1) the reinstatement of Plaintiff's DACA status; (2) the reinstatement of Plaintiff's employment authorization; (3) the Defendants to comply with the DACA Standard Operating Procedures ("SOP") "should Defendants elect to reconsider Plaintiff's DACA status;" and, (4) Defendants to accept Plaintiff's DACA renewal application. (ECF 12). Defendants complied with the Order by reinstating Plaintiff's DACA status and employment authorization, and accepting his DACA renewal application. The parties dispute whether the second DACA termination violated the DACA SOP.

On November 13, 2017, USCIS issued Plaintiff a second Notice of Intent to Terminate ("NOIT") informing him, among other things, that his DACA status was being revoked because he was an enforcement priority in light of his suspected involvement with alien smuggling. The central issue relevant to the present motions is whether Defendants complied with the DACA SOP when terminating Plaintiff's

---

[1] Citations refer to the Electronic Case File Docket Number ("ECF") and, where applicable, to an Exhibit or to the scanned header page number.

DACA status a second time, after this court had invalidated Defendants' initial termination of Plaintiff's DACA status. After providing Plaintiff with notice and an opportunity to respond to the NOIT, on December 21, 2017, Defendants revoked and terminated Plaintiff's DACA status for a second time.

The FAC, filed on January 12, 2018, alleges four claims for relief arising out of the revocation of his DACA status: (1) violation of the APA, based upon the May 2016 DACA violation; (2) violation of the APA, based upon the December 21, 2017 DACA violation; (3) violation of the due process clause of the Fifth Amendment; and (4) declaratory relief, seeking a declaration that the revocation of his DACA was unlawful. The following provides background relevant to the parties' arguments.

<u>Plaintiff Obtains DACA Status</u>

Plaintiff is a 24-year-old citizen of Mexico who was brought to the United States by his family when he was eight years old. Plaintiff and his family entered the United States without authorization from the Attorney General. Since his entry into the United States, Plaintiff has lived in San Diego, California where he graduated from Altus Charter High School in 2011. From 2011 to 2013, Plaintiff was unable to obtain lawful employment due to his immigration status. Plaintiff has no criminal convictions and had never been arrested until the 2016 detention in this case.

In June 2012, the Obama Administration created the DACA program which allowed certain immigrants to avoid deportation and obtain work permits for a period of two years, renewable upon good behavior. The contours of the DACA program were set out in a June 15, 2012 Memorandum from former Secretary of the DHS, Janet Napolitano, and which became known as the "Napolitano Memo." The Napolitano Memo provided the criteria to be satisfied before an individual could be considered for an exercise of prosecutorial discretion. In broad brush, one qualified for DACA status upon showing that the individual:

- entered the United States before his or her 16th birthday and prior to June 2007;
- lived continuously in the United States during the previous five years;

1. - was currently in school, a high school graduate or was honorably discharged from the military;
2. - was under the age of 31 as of June 15, 2012; and
3. - had not been convicted of a felony, significant misdemeanor, three or more misdemeanors, nor posed a threat to national or public safety.

The program did not, and still does not, provide lawful status or a path to citizenship, nor does it provide eligibility for federal welfare or student aid. (ECF 39-4, Exh. A).

In early 2013, satisfying all prerequisites for DACA status, Plaintiff applied for, and was granted, DACA status. Having obtained DACA status, Plaintiff was considered "lawfully present" in the country and granted an Employment Authorization Document ("EAD") and Social Security Number, which allowed Plaintiff to be lawfully employed. The approval letter issued by USCIS informed Plaintiff that "in the exercise of its prosecutorial discretion, [USCIS] has decided to defer action on" his case for a period of two years. "Deferred action does not confer or alter any immigration status." (Id. Exh. I). In 2014, DHS renewed Plaintiff's DACA status.

Upon receipt of DACA status, Plaintiff obtained full-time employment in the airline food packaging industry and worked in that industry from 2013 until May 2016, working the 7:00 p.m. to 4:00 a.m. shift. The hiring process involved interviews, drug tests, background checks, and verification of employment authorization. Plaintiff used a portion of his income to financially support his family. In May 2016, Plaintiff's DACA status was purportedly revoked by the USCIS in a Notice of Action. Plaintiff informed his employer of the loss of DACA status and was, in turn, terminated by his employer. Plaintiff's employer did, however, inform Plaintiff he could re-apply for employment once he obtained work authorization.

The First Revocation of Plaintiff's DACA Status

On May 6, 2016, Plaintiff declares that an acquaintance named Adolfo asked him, as he had in the past, to look after his dogs while he was out of town. Plaintiff went to Adolfo's home, took care of the dogs, and encountered two other individuals

at the home. Plaintiff planned to have his sister pick him up from Adolfo's house and drive him to work by 7:00 p.m., the shift start time. At 4:00 p.m., a few hours after arriving at Adolfo's house, USCBP officers knocked on the door and asked Plaintiff if they could search the premises. He informed the USCBP officers that they needed a search warrant to enter the home as he did not believe he "had permission to let them in because it was not my house." (ECF 39-2, Gonzalez Decl. ¶11). The Officers did not enter the home, but remained outside.

Around 5:00 p.m. a man not known to Plaintiff arrived, represented that he was the owner of the house, and asked Plaintiff to exit his home. Outside the home, Plaintiff was interviewed by USCBP officers and informed them that he possessed DACA status and a valid EAD. According to Plaintiff, he was then arrested, handcuffed, and spent the next two days being "aggressively" interrogated by two officers. The officers asked him about "wrongdoing at the house that I did not understand. I kept asking them for details and telling them, 'I don't understand why I'm being detained.'" (Id. ¶18). "No one interrogated [Plaintiff] after those first two or three days," or after his release from custody.

After two or three days, Plaintiff was transferred to another facility. On June 1, 2016, Plaintiff was provided with a bond hearing before Immigration Judge McSeveney, and released two days later on a $5,000 bond. Since his release, Plaintiff has not had any law enforcement contacts.

To provide additional context to Plaintiff's declaration, Defendants represent that Plaintiff (and another individual arrested at the searched house) was arrested on May 6, 2016, for harboring illegal aliens in violation of 8 U.S.C. §1324(a)(1)(A)(iii) and §1182(a)(6)(E)(i). Once the owner of the home arrived at Adolfo's residence, the owner consented to permit USCBP agents to search the residence (the renters were not at home). Inside, USCBP discovered 12 illegal aliens (five from China and seven from Mexico) hiding in the attic. The record of Deportable/Inadmissible Alien documents indicate that three material witnesses identified Plaintiff as the individual who told

them to hide in the attic.

On May 7, 2016, USCIS issued Plaintiff a Notice to Appear ("NTA") charging him as "inadmissible" to the United States (i.e. Plaintiff was deemed unlawfully present in the country) pursuant to 8 U.S.C. §1182(a)(6)(A)(i). On May 23, 2016, USCIS provided Plaintiff with a Notice of Action informing him that his DACA status and employment authorization had been automatically terminated as of the date of the NTA (May 7, 2016).

### The DACA SOP

The DACA SOP issued by DHS sets forth the procedures for adjudicating DACA applications, renewals, and the termination of participation in DACA. Among other things, the DACA SOP provision at issue here provides for termination of DACA status in the event the recipient is considered an enforcement priority by USCIS, after consultation with ICE:

> If after consulting with ICE, USCIS determines that exercising prosecutorial discretion after removal has been deferred under DACA is not consistent with the Department of Homeland Security's enforcement priorities, and ICE does not plan to issue an NTA, the officer should refer the case to HQSCOPS, through the normal chain of command, to determine whether or not a NOIT is appropriate. If it is determined that the case warrants final termination, the officer will issue DACA 603 - Termination Notice [Enforcement Priority; Not Automatically Terminated] from the Appendix I.

In addition, the DACA recipient must be provided with notice and an ability to contest the NOIT before DACA status may be terminated.

### Recent DACA Related Events

On September 5, 2017, Defendant DHS announced a plan to eliminate DACA, beginning in March 2018. DACA recipients whose status would expire on or before March 5, 2018, could have applied for a two-year renewal, but renewal applications were due on or before October 5, 2017. (ECF 39-4, Exh. C).[2]

---

[2] The court notes that two federal courts have enjoined the termination of the DACA program. See Batalla-Vidal v. Nielsen, 16cv4756 (E.D.N.Y. February 13, 2018); Regent of University of Cal. v. DHS, 17cv05221 WHA (N.D. Cal. January 9, 2018).

On February 20, 2017, Secretary of Homeland Security John Kelly issued a memorandum entitled Enforcement of the Immigration Laws to Serve the National Interest (the "Kelly Memo."  The Kelly Memo prioritizes enforcement against individuals who "have been charged with any criminal offense that has not been resolved" or allegedly "committed acts which constitute a chargeable criminal offense." The Kelly Memo also provides that DHS is authorized to commence enforcement actions against removable aliens.

> Unless otherwise directed, Department personnel may initiate enforcement actions against removable aliens encountered during the performance of their official duties and should act consistently with the President's enforcement priorities identified in his Executive Order and any further guidance issued pursuant to this memorandum. Department personnel have full authority to arrest or apprehend an alien whom an immigration officer has probable cause to believe is in violation of the immigration laws. They also have full authority to initiate removal proceedings against any alien who is subject to removal under any provision of the INA, and to refer appropriate cases for criminal prosecution.

(ECF 39-4, Exh. D at 4). The Memo also highlights that prosecutorial discretion should be exercised on a case-by-case basis:

> The exercise of prosecutorial discretion with regard to any alien who is subject to arrest, criminal prosecution, or removal in accordance with law shall be made on a case-by-case basis in consultation with the head of the field office component, where appropriate, of CBP, ICE, or USCIS that initiated or will initiate the enforcement action, regardless of which entity actually files any applicable charging documents: CBP Chief Patrol Agent, CBP Director of Field Operations, ICE Field Office Director, lCE Special Agent-in-Charge, or the USCIS Field Office Director, Asylum Office Director or Service Center Director.

In light of the numerous recent government issued memoranda concerning modifications to immigration policies, laws, regulations and procedures, the court notes that these memoranda preserve the DACA program. On June 15, 2017, Secretary Kelly issued a memorandum rescinding the Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"), but temporarily leaving the DACA program in place. (ECF 39-4, Exh. I).

The Second Revocation of Plaintiff's DACA Status

As noted above, following this court's September 29, 2017 Order granting

injunctive relief, Defendants reinstated Plaintiff's DACA status and employment authorization. Thereafter, on December 21, 2017, USCIS issued Plaintiff a NOIT, informing him that his DACA status was being terminated. The NOIT informed Plaintiff that USCIS had consulted with ICE and "determined that exercising prosecutorial discretion to defer removal action in your case is not consistent with DHS's enforcement policies." (ECF 39-6). In support of its decision, USCIS cited the following DACA SOP to support its position:

> If after consulting with ICE, USCIS determines that exercising prosecutorial discretion after removal has been deferred under DACA is not consistent with the Department of Homeland Security's enforcement priorities, and ICE does not plan to issue an NTA, the officer should refer the case to HQSCOPS, through the normal chain of command, to determine whether or not a NOIT is appropriate. If it is determined that the case warrants final termination, the officer will issue DACA 603 - Termination Notice [Enforcement Priority; Not Automatically Terminated] from the Appendix I.

The NOIT articulated Plaintiff's involvement in "what appeared to be a smuggling event" on May 6, 2017. The NOIT provided Plaintiff with notice that he was an enforcement priority in light of his suspected criminal activity. The NOIT also identified Plaintiff's involvement in suspected alien smuggling, including statements by several of the illegal immigrants that Plaintiff directed them to hide in the attic when the CBP officers arrived on the site.

On December 14, 2017, Plaintiff filed a response to the NOIT. In the main, the response represented that Plaintiff continued to satisfy all objectively verifiable DACA criteria. Notably, Plaintiff denies any involvement in alien smuggling.

<u>The Termination Notice</u>

After receipt of Plaintiff's response to the NOIT, on December 21, 2017, USCIS issued a Termination Notice to Plaintiff. The Termination Notice informed Plaintiff that USCIS consulted with ICE and determined that exercising prosecutorial discretion was "not consistent with the DHS's enforcement priorities." (ECF 39-6). In reaching the conclusion to revoke Plaintiff's DACA status, the Termination Notice repeated and expanded upon the "derogatory information" concerning the alien smuggling events

of May 6, 2016. The Termination Notice referred to the I-213 forms (Record of Deportable/Inadmissible Alien) which identified Plaintiff's purported involvement in alien smuggling activities. Plaintiff was also informed that he would have the opportunity to contest his removal in Immigration Court pursuant to INA §240.

Pending Immigration Proceedings

On May 7, 2016, CBP provided Plaintiff with a Notice to Appear ("NTA"), thereby commencing removal proceedings against him pursuant to INA §240. On November 7, 2016, the immigration proceedings against Plaintiff were terminated. However, "ICE once again confirmed it still views [Plaintiff] as an enforcement priority and issued [Plaintiff] a new NTA on December 8, 2017." (Pls. Exh. R). Plaintiff had a hearing scheduled before an Immigration Judge calendared for March 20, 2018, but that date has been continued.

Procedural History of This Action

On September 29, 2017, the court granted Plaintiff's Motion for Preliminary Injunction and (1) vacated Defendants' initial DACA revocation; (2) reinstated Plaintiff's employment authorization; (3) instructed Defendants to comply with the DACA SOP, in the event Defendants were to elect to revoke Plaintiff's DACA status; and (4) ordered Defendants to accept Plaintiff's DACA renewal application. The dispute amongst the parties centers on whether the second revocation of Plaintiff's DACA status complied with the DACA SOP.

**DISCUSSION**

**Legal Standards**

Preliminary Injunction

To obtain preliminary or temporary injunctive relief, the party must satisfy one of two tests: (1) a combination of probable success and the possibility of irreparable harm, or (2) the party raises serious questions and the balance of hardship tips in its favor. Arcamuzi v. Continental Air Lines, Inc., 819 F.2d 935, 937 (9th Cir. 1987). "These two formulations represent two points on a sliding scale in which the required

1 degree of irreparable harm increases as the probability of success decreases." Id.
2 Under both formulations, however, the party must demonstrate a "fair chance of
3 success on the merits" and a "significant threat of irreparable injury." Id; Miller v.
4 California Pac. Med. Ctr., 19 F.3d 449, 456 (9th Cir. 1994 (en banc). The court also
5 considers the public interest in the issues raised by the parties. Winter v. NRDC, Inc.,
6 555 U.S. 7, 20 (2008).

Review under the APA

Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review." 5 U.S.C. §702. The APA further states "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." Id. § 704. Section 706 instructs the court reviewing agency action to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." Not only shall the reviewing court compel agency action unlawfully withheld but shall also "hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. §§706(1) and (2)(A).

Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) dismissal is proper only in "extraordinary" cases. United States v. Redwood City, 640 F.2d 963, 966 (9th Cir. 1981). Courts should grant 12(b)(6) relief only where a plaintiff's complaint lacks a "cognizable legal theory" or sufficient facts to support a cognizable legal theory. Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1990). Courts should dismiss a complaint for failure to state a claim when the factual allegations are insufficient "to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (the complaint's allegations must "plausibly

suggest[]" that the pleader is entitled to relief); Ashcroft v. Iqbal, 556 U.S. 662 (2009) (under Rule 8(a), well-pleaded facts must do more than permit the court to infer the mere possibility of misconduct). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. at 678. Thus, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. The defect must appear on the face of the complaint itself. Thus, courts may not consider extraneous material in testing its legal adequacy. Levine v. Diamanthuset, Inc., 950 F.2d 1478, 1482 (9th Cir. 1991). The courts may, however, consider material properly submitted as part of the complaint. Hal Roach Studios, Inc. v. Richard Feiner and Co., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989).

Finally, courts must construe the complaint in the light most favorable to the plaintiff. Concha v. London, 62 F.3d 1493, 1500 (9th Cir. 1995), cert. dismissed, 116 S. Ct. 1710 (1996). Accordingly, courts must accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from them. Holden v. Hagopian, 978 F.2d 1115, 1118 (9th Cir. 1992). However, conclusory allegations of law and unwarranted inferences are insufficient to defeat a Rule 12(b)(6) motion. In Re Syntex Corp. Sec. Litig., 95 F.3d 922, 926 (9th Cir. 1996).

**The APA Claim**

The determinative issue raised in all three pending motions is whether the second DACA revocation complied with the DACA SOP. In its September 29, 2017 Order, the court instructed Defendants to "fully comply with the DACA SOP should Defendants elect to reconsider Plaintiff's DACA status." (ECF 12; Order at p.13:27-28). Defendants then issued a new NOIT to Plaintiff, afforded him an opportunity to respond, considered Plaintiff's response, and terminated Plaintiff's DACA status as of December 22, 2017, subject to further order of this court. Defendants represent that the record demonstrates they complied with the provisions of the DACA SOP such that the agencies' conduct was neither arbitrary, capricious, nor a violation of law. Plaintiff

takes a contrary view.

Defendants assert that they fully complied with the following DACA SOP in revoking Plaintiff's DACA status a second time:

> If after consulting with ICE, USCIS determines that exercising prosecutorial discretion after removal has been deferred under DACA is not consistent with the Department of Homeland Security's enforcement priorities, and ICE does not plan to issue an NTA, the officer should refer the case to HQSCOPS, through the normal chain of command, to determine whether or not a NOIT is appropriate. If it is determined that the case warrants final termination, the officer will issue DACA 603 - Termination Notice [Enforcement Priority; Not Automatically Terminated] from the Appendix I.

Defendants make a substantial showing that they complied with this DACA SOP. The NOIT identifies the above provision of the DACA SOP as the ground for terminating Plaintiff's DACA status, and represents that USCIS consulted with ICE and determined that "exercising prosecutorial discretion to defer removal action in your case is not consistent with DHS's enforcement policies." (ECF at 39-6). The basis for Defendants' argument that Plaintiff is an "enforcement priority" arises from Plaintiff's purported involvement with alien smuggling on May 6, 2016.

Plaintiff challenges and seeks to limit the term "enforcement priority," as applied to DACA recipients, to mean "a disqualifying criminal conviction, a public safety concern finding, a national security concern finding or an EPS (Egregious Public Safety) finding." (Reply at p.7:20-23). In other words, because Plaintiff has not been convicted of a crime, he contends that he is not an enforcement priority and, therefore, he has been wrongfully dispossessed of his DACA status. Further, Plaintiff argues that he is entitled to retain his "low enforcement priority" status under DACA. This argument is unpersuasive.

While DACA expressly identifies that DACA recipients are considered low enforcement priority, the DACA SOP identifies several ways that a DACA recipient loses that protected status. Not only does the DACA SOP identify that a DACA recipient loses DACA status once the recipient becomes an enforcement priority, but the Kelly Memo expressly identifies that alien individuals who "have committed acts

which constitute a chargeable criminal offense" are enforcement priorities. (ECF 39-4, Exh.D at p. 31).³ Furthermore, the November 7, 2011 USCIS Notice to Appear guidelines identify that an alien's alleged role in alien smuggling (a violation of INA §§101(a)(43)(N) and (O))is one of the offenses that triggers the characterization of an alien as a "top immigration enforcement priority," even without a conviction. (ECF 39-4 at 61-62).

The arbitrary and capricious standard of 5 U.S.C. §706(2)(A) is a narrow one. Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 418 U.S. 281, 285 (1974). The court's role under the APA is to determine whether the agency considered all relevant factors and whether there has been a clear error of judgment. "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971). The agency must articulate a "rational connection between the facts found and the choice made." Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962).

Here, the court concludes that Defendants considered all relevant factors in determining that Plaintiff was an enforcement priority within the meaning of the DACA SOP and Kelly Memo. The record before the court reveals that relevant agencies (USCIS, ICE, and CBP) consulted with each other and determined that Plaintiff committed acts which constitute a chargeable criminal offense. Defendants determined that several of the material witness aliens detained on May 6, 2016, identified Plaintiff as one of the individuals actively engaged in human trafficking conduct. The Termination Notice rationally articulates Plaintiff's perceived involvement in human trafficking, in violation of relevant statutes and regulations, and therefore, supports Defendants' determination that Plaintiff engaged in conduct

---

³ While the government does not rely on the Kelly Memo to buttress its decision, the Kelly Memo is instructive in that it expressly instructs that DHS "no longer will exempt classes or categories of removable aliens from potential enforcement," and highlights that ICE, CBP, and USCIS have the discretion "to prioritize enforcement activities." Id.

constituting a chargeable criminal offense. See Judulang v, Holder, 562 U.S. 42, 52-53 (2011) (an agency must exercise reasoned decision-making).

The DACA SOP, the Kelly Memo, and the INA provide a clear indication that the Defendant agencies possess substantial discretion to determine whether the revocation of an individual's DACA status is consistent with DHS's enforcement priorities. The DACA program specifically provides that ICE and USCIS possess the discretion to determine whether the continued exercise of prosecutorial discretion is consistent with DHS's enforcement priorities in any particular case. (ECF 39-4 at 81). The INA also provides that "[t]he Attorney General shall be charged with the administration and enforcement" of the statute and that the "determination and ruling by the Attorney General with respect to all questions of law shall be controlling." 8 U.S.C. § 1103(a)(1). The court notes that some deference is due Defendants' interpretations and determinations under the circumstances of this case, particularly where agency action is committed to agency discretion by law. See 5 U.S.C. §701(a); 8 U.S.C. §1252(g). Judicial deference to the Executive Branch is especially appropriate in the immigration context. See I.N.S. v. Aguirre-Aguirre, 526 U.S. 415, 425 (1999). Here, the court cannot conclude that Defendants violated the APA by determining that Plaintiff's involvement in alien smuggling made him an enforcement priority for purposes of the DACA program. Defendants articulated a rational connection between Plaintiff's involvement with alien smuggling and the decision to revoke Plaintiff's DACA status.

Additionally, Plaintiff makes the argument that the allegations in Plaintiff's arrest record have yet to be tested in a competent forum. However, this is not the appropriate forum to test the veracity of Defendants' underlying assertions that Plaintiff engaged in conduct that constituted a violation of the immigration laws. Pursuant to 8 U.S.C. §1252(g) and 5 U.S.C. §701(a)(2), this court lacks jurisdiction to entertain a determination on the merits of Plaintiff's alleged criminal conduct. See Rodriguez v. Sessions, 677 Fed.Appx. 447, ——, 2017 WL 695192, at *1 (9th Cir. 2017) ("We lack

jurisdiction to consider [the plaintiff's] eligibility for Deferred Action for Childhood Arrivals."); <u>Vasquez v. Aviles</u>, 639 Fed.Appx. 898, 901 (3rd Cir. 2016) ("[Section 1252(g) ] deprives all courts of jurisdiction to review a denial of DACA relief because that decision involves the exercise of prosecutorial discretion not to grant a deferred action."); <u>Fabian-Lopez v. Holder</u>, 540 Fed.Appx. 760, 761 n.2 (9th Cir. 2013) (determining that Section 1252(g) deprived the court of jurisdiction to consider the plaintiff's DACA eligibility). Plaintiff may obtain review of this claim by filing a petition for review with the Ninth Circuit. <u>See</u> 8 U.S.C. §1252(a)(5).

In the prior Order, the court concluded that Defendants violated the APA when they failed to comply with the DACA SOP. The court did not reach, nor does it now, the merits of Plaintiff's underlying conduct on May 6, 2016. Defendants have made a sufficient showing that they followed the DACA SOP, consulted with the appropriate agencies, issued a DACA compliant Notice of Termination, provided Plaintiff with the opportunity to respond to the Notice of Termination, considered Plaintiff's response, and provided Plaintiff a Termination Notice explaining the reasons for the termination of his DACA status. Under APA review, the court cannot conclude that such agency action was arbitrary, capricious, or a violation of law under 5 U.S.C. §706(2)(A) because Defendants complied with the DACA SOP.

**The Constitutional Claim**

The bedrock principle underlying procedural due process is clear: "Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must be notified." <u>Baldwin v. Hale</u>, 1 Wall 223, 233 (1863). Equally fundamental to the right to notice is the opportunity to be heard at a meaningful time in a meaningful manner. <u>Armstrong v. Manzo</u>, 380 U.S. 545, 552 (1965); <u>Mathews v. Eldridge</u>, 424 U.S. 319, 332 (1976). When protected liberty or property interests are implicated, the individual is entitled to "some kind of prior hearing" before the termination of such interests. <u>Board of Regent of State Colleges v. Roth</u>, 408 U.S. 564, (1972).

The court is unpersuaded by Defendants' argument that DACA is purely discretionary such that recipients of DACA possess no liberty, property, or other constitutional interest. The Napolitano Memo provides five criteria that must be satisfied before an illegal immigrant qualifies to obtain DACA status (entered the United States before their 16th birthday and prior to June 2007; lived continuously in the United States during the previous five years; was currently in school, a high school graduate or was honorably discharged from the military; was under the age of 31 as of June 15, 2012; and not have been convicted of a felony, significant misdemeanor, three or more misdemeanors, nor posed a threat to national or public safety). Once these objective and non-discretionary criteria are satisfied, the DACA recipient enjoys significant liberty and property interests, including the right to obtain lawful employment authorization and the right to be considered lawfully present in the United States.

In light of the liberty and property interests at stake, the court concludes that Plaintiff, under the Due Process Clause of the Fifth Amendment, is entitled to notice of a DACA termination hearing and an opportunity to meaningfully respond to the notice of DACA termination before DACA status is revoked. These are the same procedural due process protections that DACA specifically provides for and which were afforded to Plaintiff. Accordingly, Plaintiff cannot prevail on his Fifth Amendment claims.[4]

**Motion to Dissolve Preliminary Injunction**

The Preliminary Injunction entered on September 29, 2017: (1) vacated Defendants' initial DACA revocation; (2) reinstated Plaintiff's employment authorization; (3) instructed Defendants to comply with the DACA SOP, in the event

---

[4] The court does not accept Plaintiff's contention that procedural due process requires something akin to a formal judicial proceeding wherein Plaintiff has the opportunity to present evidence and cross-examine witnesses. The court also notes Plaintiff may seek judicial review of his claims by filing a petition for review pursuant to 8 U.S.C. §1252.

Defendants were to elect to revoke Plaintiff's DACA status; and (4) ordered Defendants to accept Plaintiff's DACA renewal application. For the above stated reasons, Defendants fully complied with the injunction, including the manner in which they revoked Plaintiff's DACA status a second time. Accordingly, the court grants the motion to dissolve the September 29, 2017 preliminary injunction.

**Motion for Preliminary Injunction**

In light of the court's conclusion that Defendants did not violate the APA by revoking Plaintiff's DACA status a second time, Plaintiff fails to make the requisite showing of a likelihood of success on the merits. Accordingly, the court denies Plaintiff's motion for a preliminarily injunction.

**Motion to Dismiss**

Defendants move to dismiss all four claims alleged in the FAC. The first two claims for violation of APA arise from the May 2016 and December 2017 revocations of Plaintiff's DACA status, respectively. As Plaintiff has received a remedy for the May 2016 violation of the DACA SOP, this claim is now moot. Dismissal is appropriate on the second cause of action because the second DACA revocation, for the above stated reasons, did not violate the APA. The third claim for violation of the Fifth Amendment also fails because Plaintiff received the Notice of Intent to Terminate, an opportunity to respond, and an informed Notice of Termination. For the above stated reasons, nothing more is required by the Fifth Amendment. The fourth claim for declaratory relief, for the above stated reasons is moot. Accordingly, the court grants the motion to dismiss the action with prejudice.

In sum, the court denies Plaintiff's motion for a preliminary injunction, grants Defendants' motion to dissolve the September 29, 2018 preliminary injunction, and grants Defendants motion to dismiss the FAC without leave to amend. The Clerk of Court is instructed to close the file.

DATED: April 12, 2018

_____
Hon. Jeffrey T. Miller
United States District Judge